UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                        Plaintiff,

                        v.

RONALD CLEVELAND,

                                        Defendant.
_____

REPORT & RECOMMENDATION

12-CR-6109G

## PRELIMINARY STATEMENT

By Order of Hon. Charles J. Siragusa, United States District Judge, dated August

13, 2012, all pretrial matters in the above-captioned case were referred to this Court pursuant to

28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 2).

Defendant Ronald Cleveland ("Cleveland") is charged in a two-count indictment.

The first count charges him with conspiracy to possess with intent to distribute and to distribute

five or more kilograms of cocaine and two hundred eighty or more grams of cocaine base, in

violation of 21 U.S.C. § 846. (Docket # 1). The second count charges him with possession of a

firearm in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c). (*Id.*).

Currently pending before the Court is Cleveland's motion to suppress statements

and to suppress two photographic identifications made by cooperating government witnesses on

June 1, 2011 and December 22, 2011.[1] (Docket ## 29, 42). On April 29, 2013, this Court

_____

[1] An additional photographic identification procedure was purportedly conducted on June 14, 2011; Cleveland has conceded, however, that the identification was merely confirmatory and does not seek suppression of that identification. (Tr. 47). Accordingly, this Court's report and recommendation does not address that

conducted an evidentiary hearing on the suppression motions.  (Docket ## 38, 39).  For the

reasons discussed below, I recommend that the district court deny Cleveland's motions to

suppress statements and to suppress the photographic identifications.


## FACTUAL BACKGROUND

### I.  June 1, 2011 Identification Procedure

Jennifer Morales ("Morales") testified that she is employed as an investigator for

the City of Rochester Police Department ("RPD") and has been employed by RPD for

approximately twenty years.  (Tr. 4).[2]  On June 1, 2011, she and another RPD officer, Scott Hill

("Hill"), conducted a photographic identification procedure as part of a narcotics trafficking

investigation in which they were involved.  (Tr. 5-7, 52).  According to Morales, that day she met

with a confidential informant who had a relationship with Cleveland and had indicated that he[3]

would be able to identify Cleveland.  (Tr. 6, 52-53).  Prior to the identification procedure, which

occurred in a patrol car, the informant had described Cleveland as "jacked up" (physically fit)

and had indicated that Cleveland sometimes wore his hair in braids.  (Tr. 6, 57).

During the June 1st meeting, Morales asked the informant to review a

photographic array and to indicate whether he recognized Cleveland depicted in the six

photographs.  (Tr. 7).  Morales also testified that she told the informant that Cleveland might not

have been depicted in any of the photographs and that individuals' appearances may change over

---

identification procedure.

   [2]  The transcript of the April 29, 2013 hearing shall be referred to as "Tr. __."  (Docket # 39).

   [3]  The gender of the informant was not identified at the hearing.  For ease of reference, the informant will be
identified using the masculine pronoun throughout this opinion.

time.  (*Id.*).  Morales testified that while the witness was viewing the array, neither she nor Hill made any gestures, spoke to the witness or suggested which photograph to select.  (Tr. 8).  According to Morales, the informant "immediately" identified the fifth photograph as a photograph of Cleveland.  (Tr. 7-8).  Morales asked the informant to circle the number above the identified photograph, write the name of the person depicted in that photograph and sign the array.  (Tr. 9).  The informant circled number five, wrote the name "P.T. Pretty Tony" (a nickname by which the informant knew Cleveland) and signed the array.  (Tr. 9-12).  Morales also signed the photo array.  (Tr. 10-11; Government's Exhibit ("G. Ex.") 1).

The array that the informant viewed contains six photographs of different African-American men.  (G. Ex. 1).  Photograph five depicts Cleveland.  (Tr. 9; G. Ex. 1).  Cleveland's complexion is slightly lighter than three of the other individuals, but similar to two of the other individuals.  (G. Ex. 1).  The background hue in his photograph and three of the other photographs is muted, ranging from grays to greens, while two of the other photographs have bluish-gray backgrounds.  (*Id.*).  All men depicted have braided hair and mustaches, and some have slight beards.  (*Id.*).

## II.  December 22, 2011 Identification Procedure

Morales testified that she conducted another photographic identification procedure on December 22, 2011.  (Tr. 12).  On that day, Morales and another RPD officer, Murry Hooper ("Hooper"), interviewed Shane O'Brien ("O'Brien"), one of the targets of the investigation.  (Tr. 12, 14, 58).  At the time of the interview, O'Brien was in custody; he had been advised of, and had waived, his *Miranda* rights.  (Tr. 12-13).  During the course of the interview, O'Brien

referred to Cleveland as "Cess" and stated that he would be able to identify a photograph of him. (Tr. 13). Prior to the identification procedure, O'Brien had not provided a physical description of "Cess." (Tr. 57).

Morales testified that she asked O'Brien to review a photographic array, which was the same array used in the June 1st procedure, and to indicate whether he recognized the person he knew as "Cess" in any of the six photographs. (Tr. 14; G. Ex. 1 & 2). Morales also testified that she told O'Brien that the person referred to as "Cess" may or may not have been depicted in the photographs. (*Id.*). According to Morales, while the witness was viewing the array, neither she nor Hooper spoke to O'Brien or in any way suggested which photograph should be selected. (Tr. 15).

Morales testified that the informant "immediately" identified "Cess" in photograph five. (*Id.*). Morales asked the informant to circle the number above the photograph, record the name of the person who was depicted in the photograph and sign the array. (Tr. 16). O'Brien circled number five, wrote the name "Ses" and signed the array. (Tr 16-18; G. Ex. 2). Morales and Hooper also signed the photo array. (Tr. 18; G. Ex. 2).

### III. May 24, 2012 Statements

#### A. Testimony of Hooper

Hooper testified that she has been employed as an investigator with the RPD for approximately seventeen years. (Tr. 58-59). On May 24, 2012, at approximately 11:00 a.m., Hooper and Morales responded to 9 Parkside Avenue, Rochester, New York after learning that Cleveland had been arrested there. (Tr. 59, 73). According to Hooper, Cleveland was in custody

at the time she arrived. (Tr. 59). Cleveland was advised that he was under arrest for grand

larceny and would be transported to the Public Safety Building. (Tr. 75-76). When Hooper

arrived, Cleveland's two children were also in the residence, and Hooper spoke with Cleveland

to determine who could care for the children and asked him where the children's clothing was

located so that she could dress the children. (Tr. 60, 74-75). Hooper testified that, other than the

questions pertaining to the children, neither she nor any of the other officers questioned

Cleveland. (Tr. 60-61). Despite that, Hooper testified, Cleveland began making statements.[4]

(Tr. 61). According to Hooper, none of the officers asked any follow-up questions in response to

Cleveland's statements. (Tr. 61-62).

   After hearing the statements, Hooper advised Cleveland of his *Miranda* rights

"out of an abundance of caution." (Tr. 62). Hooper testified that she told Cleveland that she was

going to read him his rights in order to protect him and to protect the police officers. (Tr. 65).

Because Hooper did not have a *Miranda* card with her, she initially began reciting the *Miranda*

warnings from memory. (Tr. 62). Her sergeant interrupted the recitation and asked if any of the

other officers had a *Miranda* card that Hooper could use. (*Id.*). Another officer did, and she read

the rights verbatim to Cleveland. (Tr. 62, 65-66; G. Ex. 7).

   After reading the rights, including the right to remain silent, Hooper read aloud

the first question on the rights card: "Do you understand each of these rights I have explained to

you?" (Tr. 63-66; G. Ex. 7). Hooper testified that Cleveland responded, "I know my rights, I

haven't done anything wrong, I have nothing to hide." (Tr. 64-65). Hooper did not read aloud

---

[4] According to Hooper, Cleveland made the following types of statements: "I knew the feds were coming for me. Why am I getting arrested now when I've stopped doing stuff? I'm not doing anything now, and now I'm getting arrested." (*Id.*).

the second question on the card, which asked: "Having these rights in mind, do you wish to talk to us now?" (*Id.*; G. Ex. 7).

Hooper testified that after she completed reading the *Miranda* warnings, none of the officers posed any questions to Cleveland, and Cleveland made no additional statements at that time. (Tr. 65). Hooper also testified that while Cleveland was at 9 Parkside Avenue, he appeared "agitated." (Tr. 66-67). Approximately five minutes later, Cleveland was transported to the Public Safety Building. (Tr. 65).

Several hours later, at approximately 2:30 p.m., Hooper and Morales began to interview Cleveland at the Public Safety Building. (Tr. 74). Hooper testified that at the beginning of the interview, Morales introduced herself and Hooper and told Cleveland that she understood that Hooper previously had read him his *Miranda* rights. (*Id.*). According to Hooper, Cleveland responded, "Yes." (*Id.*). Hooper testified that Morales then asked Cleveland if he still wanted to talk to Hooper and herself, and Cleveland responded, "Yes." (*Id.*). At that time, Hooper and Morales proceeded to interview Cleveland. (*Id.*).

## B. **Testimony of Morales**

Morales testified that on May 24, 2012, at approximately 11:00 a.m., she and Hooper responded to 9 Parkside Avenue, Rochester, New York after being informed that Cleveland had been arrested at that location. (Tr. 18-19, 59). Morales testified that she entered the residence, observed Cleveland in handcuffs, two small children, and marijuana in plain view. (Tr. 19). According to Morales, she left the premises shortly after arriving in order to draft an application for a search warrant for the residence. (Tr. 19-21). While at the premises, Morales did not speak to Cleveland, nor did she overhear any other officers speak to him. (Tr. 19).

Morales testified that prior to interviewing Cleveland later in the day, Hooper informed her that Cleveland had made a number of spontaneous statements, that Hooper had read Cleveland his *Miranda* rights and that Cleveland had indicated that he understood those rights. (Tr. 21-22).

Cleveland arrived at the Public Safety Building at approximately 11:38 a.m. (Tr. 49). Shortly thereafter, Cleveland was taken to the bathroom and given some water. (Tr. 23, 49). Cleveland was then placed in an interview room and one of his hands was handcuffed to a table. (Tr. 22, 49-50). Cleveland remained there until approximately 2:30 p.m. when Morales and Hooper entered the room to begin interviewing Cleveland. (*Id.*). At that time, Morales testified that she gave Cleveland a cherry-flavored soda to drink. (Tr. 22-23).

Morales testified that upon entering the room, she introduced herself and Hooper. (Tr. 23-24). According to Morales, Cleveland indicated that he knew who they were. (*Id.*). Morales testified that she then asked Cleveland whether Hooper previously had read him the *Miranda* rights and whether he remembered that. (Tr. 24). According to Morales, Cleveland responded that he did remember. (*Id.*). Morales further testified that she then asked Cleveland whether "he agreed to still sit down and talk with us." (*Id.*). According to Morales, Cleveland responded that he did. (*Id.*).

Morales testified that she then proceeded with the interview. (*Id.*). Morales described Cleveland as "extremely cooperative, eager to tell his side of the story" and noted that at some times Cleveland was "flirtatious." (Tr. 25). At one point during the interview, according to Morales, Cleveland began crying while discussing his children and his childhood. (Tr. 25-26). Morales indicated that the crying lasted "less than a few minutes" and that Cleveland was not

"sobbing." (Tr. 27).  At no point did Cleveland ask Morales to stop questioning him, and she testified that they proceeded with the interview. (Tr. 28).  According to Morales, during the course of the interview, she discussed with Cleveland the reasons he had been brought to the Public Safety Building, including that he had stolen money from the police and that he was under investigation for narcotics conspiracy. (Tr. 50-51).

According to Morales, at approximately 2:45 p.m., she began to take a written statement from Cleveland. (Tr. 33).  To create the written statement, Morales testified that she asked Cleveland a question and then recorded his answer. (*Id.*).  After she completed the statement, she sat next to Cleveland and read the statement aloud with him. (Tr. 34, 51-52).  According to Morales, she pointed out that the rights previously read to Cleveland by Hooper were typewritten at the top of the statement.[5] (Tr. 34-35; G. Ex. 5).  She then read the following statement:  "I have read this statement of my rights (or have had this statement read to me) I willingly make the following statement." (Tr. 35; G. Ex. 5).  Morales and Cleveland then read aloud the statements that had been handwritten by Morales. (Tr. 35).  According to Morales, as

---

[5]  The rights which were typewritten at the top of the written statement provided as follows:

- I HAVE THE RIGHT TO REMAIN SILENT;

- I DO NOT HAVE TO SAY ANYTHING IF I DON'T WANT TO;

- ANYTHING THAT I DO SAY CAN BE USED AGAINST ME IN A COURT OF LAW;

- I HAVE THE RIGHT TO TALK TO A LAWYER BEFORE I ANSWER ANY QUESTIONS AND HAVE THEM HERE WITH ME DURING ANY QUESTIONING IF I WISH;

- THAT IF I AGREE TO TALK ABOUT THIS MATTER WITHOUT A LAWYER PRESENT, I CAN STOP TALKING AT ANY TIME.

(G. Ex. 5).

they read the statements, Cleveland expressed a desire to make some changes to the statement. (*Id.*). Morales testified that each modification suggested by Cleveland was made by either herself or Cleveland and then initialed by Cleveland. (Tr. 35-36).

After they had completed reading the handwritten statement, Cleveland requested that two additional sentences be placed at the end of the statement. (Tr. 37). After the addition of these sentences, Cleveland indicated that the statement was accurate and truthful, and he signed every page of the statement. (Tr. 37-39, 52; G. Ex. 5). The interview concluded at approximately 3:40 p.m. (*Id.*).

Morales testified that during the course of the interview neither she nor any other officers used force, made any promises or threats to Cleveland or gave Cleveland any medication. (Tr. 40). In addition, according to Morales, Cleveland never asked the officers to stop questioning him, requested an attorney or indicated that he no longer wished to speak to the officers. (Tr. 40-41). Further, Morales testified that Cleveland did not appear to be under the influence of alcohol or drugs. (Tr. 41).

## IV. **Cleveland's Affidavit**

In support of his suppression motions, Cleveland submitted an affidavit affirming that he was arrested on the morning of May 24, 2012. (Docket # 29-1). According to Cleveland, after he was placed in handcuffs, Hooper began reciting his *Miranda* warnings, but she only provided part of the *Miranda* warnings because she did not have a rights card with her. (*Id.* at ¶ 3). Cleveland's affidavit states that another officer proceeded to read the remainder of the *Miranda* warnings from his rights card. (*Id.*). Cleveland contends that after his rights were read

to him, he told Hooper that he had "nothing to say" to the officers. (*Id.*). At that time, Cleveland was transported to the Public Safety Building and was placed in an interview room. (*Id.* at ¶ 4).

Approximately three hours later, Cleveland was interviewed by Morales and Hooper. (*Id.* at ¶¶ 4-5). According to Cleveland, at the start of the interview he told Hooper and Morales that he did not want to speak to them and that he wanted a lawyer. (*Id.* at ¶ 5). Cleveland contends that in response, Hooper and Morales told him that he would not be violated by parole if he agreed to speak with them. (*Id.*). Cleveland maintains that he did not know that he was the target of a federal investigation and that he understood that he would be released from custody if he spoke with Hooper and Morales. (*Id.*). According to Cleveland, he believes that he was "tricked" into giving a statement. (*Id.* at ¶ 6). Finally, Cleveland contends that he was "emotionally distraught and crying through the whole interview." (*Id.*).

Morales and Hooper testified that several statements in Cleveland's affidavit are false. (Tr. 41-46, 69-72). Morales testified, for example, that Cleveland never indicated that he did not want to speak to them or that he wanted a lawyer. (Tr. 42). Instead, according to Morales, Cleveland was eager to speak to the investigators. (*Id.*). Likewise, Hooper testified that Cleveland never stated that he had nothing to say to the officers, that he did not want to speak to them or that he wanted a lawyer. (Tr. 70).

Morales also testified that the investigators never told Cleveland that he would avoid a parole violation if he agreed to speak with them. (Tr. 42-43). To the contrary, Morales testified that they told Cleveland that they did not know what the Parole Division would do. (*Id.*). Similarly, Hooper testified that they never told Cleveland that he would not be violated or released from custody if he agreed to speak with the investigators. (Tr. 71).

In addition, according to both Morales, Cleveland was told that he was the target of a federal narcotics investigation. (Tr. 43, 50, 71-72). Both Hooper and Morales testified that although Cleveland did cry during the interview, the tears only lasted a few minutes and Cleveland did not appear emotionally distraught. (Tr. 44, 72).

In sum, although Cleveland has submitted an affidavit in which he asserts that he told the investigators that he had nothing to say to them, that he requested an attorney and that the investigators led him to believe that he would not receive a parole violation if he agreed to speak with them, each of these assertions is contradicted by the testimony of both Hooper and Morales. I find that Hooper and Morales provided credible and consistent testimony concerning the events of May 24, 2012, and I credit their testimony to the extent that it conflicts with the assertions in Cleveland's affidavit.

## DISCUSSION

### I.  Motion to Suppress Photographic Identifications

I turn first to Cleveland's motion to suppress evidence of the two photographic identifications. (Docket # 29).

Evidence of an out-of-court photographic identification will be suppressed under the due process clause if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). In determining whether to exclude evidence of a pretrial identification, a court must first consider whether the identification procedure was unduly suggestive. *Id.* To decide whether a photographic array is unduly

suggestive, a court should consider several factors, including "the size of the array, the manner of presentation by the officers, and the array's contents." *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990), *cert. denied*, 501 U.S. 1233 (1991). Specifically, the court must consider "whether the picture of the accused . . . so stood out from all the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit." *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (internal citations omitted).

If the identification procedure was unduly suggestive, the court must proceed to determine whether the identification nevertheless possesses "sufficient aspects of reliability."[6] *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977). "Even if the procedure was unnecessarily (or impermissibly) suggestive . . .[,] a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'" *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

On the record before the Court, I find that neither of the identification procedures at issue was unduly suggestive. First, the manner in which the officers presented the array to the witnesses in no way suggested to the witnesses which, if any, photograph to select. The record establishes that both witnesses were instructed that Cleveland may or may not have been depicted in the photographs contained in the array. Further, the testimony establishes that none of the

---

[6] At the government's request, this Court bifurcated the *Wade* hearing and addressed only the issue of whether the procedure was unduly suggestive.

officers made any comments or gestures to direct the witness to a particular photograph. Finally, the fact that the witnesses were instructed to indicate whether they recognized the defendant in the array, as opposed to a more general instruction of whether they identified or recognized anyone, did not render the procedure unduly suggestive. *See United States v. Rosa*, 11 F.3d 315, 330-31 (2d Cir. 1993) (procedure not unduly suggestive where witness was shown a six-photograph array and asked whether he could identify two of the defendants in the array), *cert. denied*, 511 U.S. 1042 (1994).

       I also find that the array itself was not unduly suggestive. Cleveland's photograph is one of six photographic images of different African-American men of roughly similar ages. All are head shots and feature men with braided hair of various lengths and mustaches, some of whom have slight beards. There are few minor differences of lighting and background between some of the photographs. For instance, Cleveland's face is lighter than the faces of three of the other men, as a result of both the quality of the photograph and Cleveland's complexion. Yet, Cleveland's face is similar in complexion to the two remaining men depicted in the photographs. In addition, Cleveland's photograph has a similar background hue to three of the other photographs; although, two of the photographs contain a noticeably grayer background. I find that these differences in color and shading do not draw the viewer's eye to Cleveland's photograph and are not significant enough to "suggest to an identifying witness that [the defendant] was more likely to be the culprit," *Jarrett v. Headley*, 802 F.2d at 41. *Compare United States v. Douglas*, 525 F.3d 225, 243 (2d Cir.) ("[a]s to the background colors of the photos, no two are the same, and no picture stands out because of its background color"), *cert. denied*, 555 U.S. 1033 (2008); *United States v. Bautista*, 23 F.3d at 731 ("[w]hile it is true that

the photograph of [the defendant] is brighter and slightly more close-up from the others, we find that these differences did not render the array suggestive"); *United States v. Stanley*, 2009 WL 5066864, *6 (E.D.N.Y. 2009) ("the difference in background colors did not place undue focus on [the defendant] because the filler backgrounds were not all uniform either") *with United States v. Saunders*, 501 F.3d 384, 390 (4th Cir. 2007) ("[the defendant's] photo stood out sharply from the others in the array [as a result of] . . . [t]he dark background and lack of overhead lighting"), *cert. denied*, 552 U.S. 1157 (2008); *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir.) ("differences such as background color can make a picture stand out, and can act to repeatedly draw a witness's eye to that picture"), *cert. denied*, 513 U.S. 1007 (1994); *United States v. Friedman*, 1996 WL 612456, *27 (E.D.N.Y. 1996) (array suggestive because "[w]hen [the defendant's] pale complexion and the background are viewed in conjunction, the effect is quite striking [, . . . making the defendant's] photograph stand[] out in both arrays in a manner that is extremely distinctive"), *aff'd in part and rev'd in part on other grounds*, 300 F.3d 111 (2d Cir. 2002), *cert. denied*, 538 U.S. 981 (2003).

Accordingly, I recommend that the district court deny Cleveland's motion to suppress the two photographic identifications.


## II. <u>Motion to Suppress Statements</u>

Next, I turn to Cleveland's motion to suppress the oral and written statements he made to Hooper and Morales at the Public Safety Building on May 24, 2012.[7]  (Docket # 42 at

---

[7] Cleveland also made statements on May 24, 2012 while in custody at 9 Parkside Avenue before being transported to the Public Safety Building; Cleveland's motion, as amplified by his supporting affidavit, does not appear to seek suppression of those statements.  (Docket ## 29, 42).

¶ 1).  Cleveland contends that the statements should be suppressed because he did not voluntarily or knowingly waive his *Miranda* rights prior to speaking with Hooper and Morales.[8]  (*Id.*).  The government contends that by agreeing to speak to Hooper and Morales after having previously been advised of his *Miranda* rights, Cleveland implicitly, if not explicitly, voluntarily waived his right to remain silent.  (Docket # 52 at 6-7).

     *Miranda* established the well-settled rule that the government may not introduce as evidence a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that privilege.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  It is undisputed in this case that Cleveland was in custody and subjected to interrogation during the interview with Hooper and Morales.  The question is whether Cleveland validly waived his *Miranda* rights.

     To establish a valid waiver, the government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."  *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  The law "does not impose a formalistic waiver procedure that a suspect

---

    [8]  In his initial moving papers, Cleveland invoked the Sixth Amendment right to counsel as a legal basis to warrant suppression of his statements; however, his post-hearing submission relies solely upon his Fifth Amendment right to counsel.  (Docket ## 29 at ¶ 8; 42 at ¶¶ 6-10).  At the time of the challenged statements, Cleveland's Sixth Amendment right to counsel had not attached.  *See Rothgery v. Gillespie Cnty., Tex.*, 544 U.S. 191, 198, 202-03 (2008) (Sixth Amendment right to counsel attaches at the commencement of prosecution which includes "the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment") (internal quotation omitted); *Fellers v. United States*, 540 U.S. 519, 524 (2004) ("an accused is denied the basic protections of the Sixth Amendment when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of counsel") (alterations in original) (internal quotations omitted).

must follow to relinquish [his *Miranda* rights;] . . . the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2262 (2010). Thus, the government need not "obtain an express waiver of [*Miranda* rights] before proceeding with the interrogation." *Id.* (alteration in original) (quoting *North Carolina v. Butler*, 441 U.S. 369, 379 (1979) (Brennan, J., dissenting)). Instead, an implicit waiver may be inferred from the defendant's conduct. *See id.* (waiver may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver") (quoting *North Carolina v. Butler*, 441 U.S. at 373).

To demonstrate the adequacy of a waiver, the government must do more than provide evidence that a *Miranda* warning was given and that the defendant thereafter made an uncoerced statement. *See Berghuis v. Thompkins*, 130 S. Ct. at 2261. The government "must make the additional showing that the accused understood the[] rights." *See id.* Accordingly, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 2262.

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993). In evaluating the totality of the circumstances, the court must assess: "(1) the

characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011). Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary. *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010)), *cert. denied*, 133 S. Ct. 48 (2012).

On the record before me, I find that Cleveland was properly advised of his *Miranda* rights and voluntarily waived them before speaking to the investigators. Hooper testified that she advised Cleveland of his *Miranda* rights by reading them from a rights card. Hooper also testified that she asked Cleveland whether he understood his rights and testified that Cleveland stated that he did. Morales and Hooper both testified that approximately three hours later, prior to initiating an interview, Morales asked Cleveland whether he remembered being read his rights and whether he agreed to talk to the investigators. According to both investigators, Cleveland responded affirmatively to both questions.

Morales's failure to read the last question on the rights card in order to obtain an explicit answer from Cleveland to the waiver question does not require suppression. *See Berghuis*, 130 S. Ct. at 2262-63 (defendant's waiver could be inferred where the evidence established he was provided a written copy of *Miranda* warnings, each warning was read aloud to defendant, defendant never indicated that he did not understand the rights, defendant provided a statement after remaining silent for almost three hours and where there was no evidence of coercion). Cleveland was advised of his rights, stated that he understood his rights and agreed to

speak with Hooper and Morales. Such facts establish that Cleveland knowingly and voluntarily waived his rights – whether he did so explicitly or implicitly.

Indeed, the Second Circuit has found an implied waiver under similar circumstances. *See United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir.), *cert. denied*, 498 U.S. 816 (1990). In *Scarpa*, like the present case, the defendant was advised of his *Miranda* rights and explicitly stated that he understood them. *See id.* at 66. After reading the rights, the officer did not ask the defendant whether he wanted to waive his rights because he did not intend to interrogate the defendant. *Id.* The defendant was then transported to jail, where he spent the night. *Id.* The next morning, approximately six hours after receiving his *Miranda* warnings, the defendant made statements to the same officer during the course of a "relaxed and friendly" conversation. *Id.* at 68. The Second Circuit concluded that under the circumstances a waiver could be inferred. *See id*.

In addition, given the short time – approximately three hours – between the administration of the warnings at Cleveland's residence and his subsequent interview at the Public Safety Building, the failure to re-advise him of his rights, considering the totality of the circumstances, does not require suppression. *See*, *e.g.*, *Berghuis*, 130 S. Ct. at 2263 ("[p]olice are not required to rewarn suspects from time to time"); *United States v. Banner*, 356 F.3d 478, 480 (2d Cir. 2004) ("once an arrested person has received a proper *Miranda* warning, the fact that questioning is stopped and then later resumed does not necessarily give rise to the need for a new warning[;] . . . [i]f the person in custody has been sufficiently informed of his or her constitutional rights, his or her *Miranda* rights have been vindicated"), *vacated on other grounds sub nom. Forbes v. United States*, 543 U.S. 1100 (2005); *United States v. Weekley*, 130 F.3d 747,

18

751 (6th Cir. 1997) ("a number of circuits have ruled that re-warning is not required simply because time has elapsed") (collecting cases); *Salierno v. Artus*, 2010 WL 2723214, *6 (E.D.N.Y.) ("[g]enerally, renewed warnings need not be given unless the circumstances have changed so seriously that the suspect's answers no longer are voluntary, or he no longer is making a knowing and intelligent relinquishment or abandonment of his rights") (internal quotation omitted), *report and recommendation adopted by*, 2010 WL 2723259 (E.D.N.Y. 2010); *United States v. Morgan*, 2009 WL 152646, *4 (N.D.N.Y. 2009) ("the passage of time between the administration of *Miranda* warnings to the [d]efendant and the later questioning by [the agent] while the [d]efendant was inside the police vehicle does not render the [d]efendant's *Miranda* warnings invalid[;] . . . [c]ourts must look to the totality of the circumstances to determine whether renewed warnings are necessary").

       Further, the credible testimony establishes that Cleveland's statements were not coerced. As an initial matter, nothing in the record suggests that Cleveland's age or characteristics rendered him particularly vulnerable to coercion, or that he was intoxicated, sick or in pain. In fact, Morales testified that Cleveland seemed eager to speak with the investigators and, with the exception of a few emotional moments when speaking about his children, Cleveland was calm, did not seem to be emotionally disturbed and appeared to understand what the investigators were asking him. Second, Morales testified that neither she, nor any other officer, made any promises to or threatened or coerced Cleveland in order to induce him to speak. Finally, the conditions under which the statements were made do not suggest that Cleveland was subjected to any undue influence to induce a statement. At the time of the interview, Cleveland had been detained for approximately three hours. (Tr. 9, 37). Although during that time

Cleveland was handcuffed and detained in an interview room at the Public Safety Building, the evidence shows that Cleveland was provided beverages and permitted to use the restroom.

Accordingly, I recommend that the district court deny Cleveland's motion to suppress the oral and written statements.

## **CONCLUSION**

For the reasons stated above, I recommend that the district court deny Cleveland's motion to suppress the two photographic identifications and his motion to suppress statements. (Docket # 29).

_____*s/Marian W. Payson*_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
September __3__, 2013

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[9]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       September ___3___, 2013

---

[9]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).